**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN**

|  |  |
|---|---|
| **STRYKER CORPORATION**, a Michigan corporation, | |
| Plaintiff, | Case No.: |
| | The Honorable _____ |
| v. | |
| **CHRISTOPHER DUNN**, an individual, and **CORRIN GENOVESE**, an individual, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Plaintiff Stryker Corporation ("Stryker" or the "Company") files this Complaint against

Defendants Christopher Dunn ("Dunn") and Corrin Genovese ("Genovese"), alleging as follows:

## INTRODUCTION

1.      Plaintiff Stryker is a global leader in the development, manufacture, and sale of

medical devices and technologies.  Defendants Dunn and Genovese are a pair of former Stryker

employees who left the Company in November 2025 to work for competitor Zimmer Biomet

("Zimmer")—and are now competing against Stryker in unlawful ways.

2.      While at Stryker, Defendants worked closely together as sales representatives in

Stryker's orthopaedic business primarily responsible for the sale of Mako SmartRobotics™

systems ("Mako").  Because sales representatives like Dunn and Genovese develop deep

1

relationships with Stryker's customers and are privy to competitively sensitive Confidential Information[1], Stryker must place great trust in its salesforce.

3.      To protect itself from abuses of that trust, Stryker requires sales representatives to agree to reasonable restrictive covenants that prevent departing employees from misappropriating customers, poaching employees, and misusing Confidential Information.  Dunn and Genovese both signed such Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreements (the "Agreements") as a condition of their employment with Stryker. (Exs. 1, 2.)

4.      Two days after Dunn and Genovese resigned, Stryker sent letters reminding them of their post-employment obligations to Stryker under the Agreements—and, in response, received assurances that Defendants intended to abide by the Agreements.

5.      Stryker has learned, however, that Dunn and Genovese have flouted their obligations by: (a) assuming roles at Zimmer that run afoul of their non-competes; (b) pursuing Stryker customers that are expressly off-limits; (c) improperly soliciting Stryker employees to leave for Zimmer; and (d) misusing Stryker's Confidential Information against it.

6.      Stryker seeks damages and injunctive relief to remedy Defendants' breaches of the Agreements.

### PARTIES, JURISDICTION, AND VENUE

7.      Plaintiff Stryker Corporation is a public corporation organized under the laws of the State of Michigan with its principal place of business in Kalamazoo County, Michigan.  Stryker regularly conducts business in this state.

8.      Upon information or belief, Dunn is an individual who resides in Allendale, New Jersey.

---

[1] *See infra* ¶ 27 (discussing scope of "Confidential Information" at issue).

9.    Upon information or belief, Genovese is an individual who resides in Buffalo, New York.

10.    This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states, and the matter in controversy exceeds $75,000, excluding interest and costs.

11.    Additionally, this Court has personal jurisdiction over Defendants, and venue is proper in this District under 28 U.S.C. § 1391(a), because Defendants consented to personal jurisdiction and venue in the federal and state courts of Michigan when they signed the Agreements.  (*See* Agreements § 8.2.)

## FACTUAL ALLEGATIONS

### A.    Stryker Invests in Cutting-Edge Joint Replacement Technology.

12.    Stryker is a global leader in medical technologies offering innovative products and services in MedSurg, Neurotechnology, and Orthopaedics that help improve patient and healthcare outcomes.

13.    Stryker conducts its orthopaedic business through multiple operating divisions, including its Joint Replacement division and Mako and Enabling Technologies ("MET") business unit.

14.    Joint Replacement is one of Stryker's principal U.S. divisions and is responsible for the development, commercialization, and sale of orthopaedic implant systems, including hip and knee replacement products, as well as associated instruments and services.  The Joint Replacement division engages in activities spanning research and development, regulatory, clinical, manufacturing coordination, sales, and marketing.

15.    Stryker's MET business unit designs, develops, commercializes, and supports capital equipment, software, and enabling tools used in orthopaedic procedures to enhance the use

3

of orthopaedic implants.  Included in MET's portfolio is the Mako SmartRobotics system—a robotic-assisted surgery platform used in orthopaedic procedures, including hip, knee, shoulder, and spine procedures, that combines pre-operative planning, intra-operative guidance, and robotically enabled instrumentation to assist surgeons in executing planned bone preparation and placement of Stryker implants.  Stryker was an early entrant into the orthopaedic robotics space and is a market leader.

16.    Stryker's Joint Replacement and MET businesses are intrinsically linked.  Mako is FDA-cleared for use only with specified Stryker implants and is, therefore, sold as an integrated capital-and-implant ecosystem.  As a result, the loss of a Mako sale at a customer account directly results not only in the loss of revenue stemming from the Mako itself, but also in lost implant sales at that account.

17.    Stryker's intellectual property and customer relationships in its orthopaedic businesses have great value—and must be protected from misappropriation—due to the major investments Stryker has made in this business.  Stryker has, among other things, invested significantly in relationship-building with customers, and devoted substantial resources to research and development.

**B.    Stryker Places Great Trust in Its Salesforce.**

18.    In addition to its technology, Stryker invests substantially in building a strong salesforce.  Sales representatives are critical to the success of the business, as they are the face of Stryker to customers.

19.    Sales representatives spend significant time with Stryker's customers, educating and training surgeons on Stryker's products, providing ongoing support to surgeons and their staff, and generally building relationships of trust with surgeons.  Sales representatives also learn and

4

provide services tailored to surgeons' preferences—from the organization of surgical trays to instrumentation preferences.  Because Stryker's robotics technology is integrated into each step of the operating room workflow (including pre-operative planning, intra-operative guidance, and robotic-arm assisted execution), Stryker's representatives enjoy the privilege of collaborating closely with surgeons to support these cases.  Given the intensity of their partnership, Stryker's customers often become loyal to the sales representatives with whom they work.  Therefore, it is crucial to protect these customer relationships from unfair interference (like that occurring here).

20.     Stryker's sales representatives are also privy to the Company's competitively sensitive Confidential Information, such as pricing and profitability strategies, product development plans, marketing strategies, and customer information.  As such, it is also important for Stryker's sales representatives to safeguard the Confidential Information entrusted to them.

**C.     Dunn and Genovese Join Stryker and Agree to Reasonable Restrictive Covenants Protecting Stryker from Unfair Competition.**

21.     Dunn was employed by Stryker from 2006 to 2008, then returned from October 2012 until November 2025, when he left for Zimmer.  For years, Dunn was Stryker's top Mako sales representative.  His assigned sales territory consisted of New York City, the NY Metropolitan area (including Westchester and Long Island), Northern New Jersey, and Connecticut—though, as discussed below, he also engaged with customers in Genovese's territory.

22.     Genovese was employed by Stryker from May 2018 until November 2025.  She was assigned a sales territory that included upstate New York, Ohio, and Pennsylvania.  She also actively supported Dunn in his assigned territory.

23.     Defendants each agreed to reasonable post-employment contractual obligations by signing Stryker's Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement—Genovese on April 6, 2020, and Dunn on December 11, 2024. (Exs. 1, 2.)

Specifically, Defendants agreed to the following four restrictions while employed by Stryker and for a one-year, post-separation "Restricted Period":

### 1. *Non-Compete*

24.    Defendants agreed not to work for "any Conflicting Organization in which the services [they] may provide could enhance the use or marketability of a Conflicting Product or Service by application of Confidential Information which [they] have had access to during [their] employment or while working for" Stryker.  (Agreements § 6.3(a).)  This restriction applies to each employee's assigned sales territory, as well as "any geographic area, territory, branch, and assigned customer accounts to which [the employee] provided services, covered cases, made proposals, made sales or serviced products whether directly or indirectly, at any time during" the employee's last year with Stryker. (*Id.* § 6.3(c).)

25.    A "Conflicting Organization" is defined as "any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a Conflicting Product or Service." (Agreement § 2.4.)

26.    A "Conflicting Product or Service" is "any product, process, technology, machine, invention or service of any person or organization other than Stryker in existence or under development which is similar to, resembles, competes with or is intended to resemble or compete with a product" Defendants knew about during the last two years of their employment with Stryker. (*Id.* § 2.3).

27.    "Confidential Information" is defined as "know-how, trade secrets, and technical, business and financial information and any other non-public information in any way learned by me, disclosed to me or developed by me during my employment with Stryker, including, but not limited to (a) prices, renewal dates and other detailed terms of customer or supplier contracts and

6

proposals; (b) information concerning Stryker's customers, clients, referral sources and vendors, and potential customers, clients, referral sources and vendors . . . (d) pricing policies, methods of delivering services and products, and marketing and sales plans or strategies; . . . (f) certain personnel or payroll records or information; . . . [and] (h) acquisitions, divestitures, expansion plans, management policies and other business strategies[.]" (*Id.* § 2.2.)

### 2.  *Customer Non-Solicitation*

28.     Defendants agreed that they would "not, in any capacity, directly or indirectly, personally or through another person, (i) solicit, contact or sell any Conflicting Product or Service to a Stryker Customer, (ii) solicit, contact, or sell any product or service to a Stryker Customer that competes with a or is similar to any Stryker product or service; (iii) divert, entice or otherwise take away from Stryker the business or patronage of any Stryker Customer."  (*Id.* § 6.2.)

29.     "'Stryker Customer' means any of the current or prospective accounts, customers, doctors, hospitals, group purchasing organizations, integrated delivery networks or clients, with whom I have had direct or material contact during the last twenty-four (24) months of my employment with Stryker . . . or about whom I learned Confidential Information during my employment with Stryker . . . , including, but not limited to: (a) any customer that purchased Stryker products or services, (b) any prospect that received or requested a proposal to purchase Stryker products or services, (c) any affiliate of such customer or prospect, or (d) any of the individual customer or prospect contacts that I established, serviced, sold to, attended training or seminars with or learned confidential information about." (*Id.* § 2.9.)

### 3.  *Employee Non-Solicitation*

30.     Dunn and Genovese also agreed not to, "directly or indirectly, solicit, induce or influence, or attempt to solicit, induce or influence, any person engaged as an employee,

independent contractor or agent of Stryker to terminate his, her, or its employment and/or business relationship with Stryker or do any act which may result in the impairment of the relationship between Stryker and its employees, independent contractors or agents." (*Id.* § 6.4.)

### 4. *Confidentiality*

31.     The Agreements prohibit the use or disclosure of Stryker's Confidential Information, expressly "recogniz[ing] that Confidential Information and trade secrets are of great value to Stryker, that Stryker has legitimate business interest in protecting its Confidential Information and trade secrets, and that the disclosure to anyone not authorized to receive such information, including any entity that competes with Stryker, will cause immediate and irreparable injury to Stryker." (*Id.* § 5.1 (emphasis added).)  Unlike the restrictive covenants above, Defendants' confidentiality obligation is not limited to one year, but is indefinite.

32.     Defendants agreed that these provisions "are fair and reasonable limitations as to time, geographic area and scope of activity, and such restrictions do not impose a greater restraint than is necessary to protect the goodwill and other business interests of Stryker." (*Id.* § 8.3.)

33.     Defendants also agreed that they would be liable for Stryker's reasonable legal expenses in any successful action the enforce the Agreements. (*Id.* § 8.1.)

## D.    Defendants Work Closely Together Across Their Assigned Territories.

34.     Although Dunn and Genovese were formally assigned to separate sales territories, in reality, they acted in concert, as a duo.  They attended customer engagements in each other's territories, provided feedback on each other's customer proposals, and shared Confidential Information about each other's customers.

35.     Defendants also worked with national and regional integrated delivery networks and group purchasing organizations that extended into each other's assigned territories and beyond.

8

36.    Within the last two years of their employment at Stryker, Defendants jointly attended at least eleven customer engagements in Dunn's territory, including multiple New York City-area dinners with healthcare providers.

37.    Genovese also mentored and coached an Associate Account Executive on deals in Dunn's territory, including in connection with customer meetings attended by both Defendants and the Associate Account Executive.

38.    Dunn was likewise active in Genovese's territory.  For example, he joined Genovese for multiple engagements with Albany-based healthcare providers in her territory.

39.    Dunn was planning to join Genovese in Pittsburgh, Pennsylvania in March 2025 for a business meeting with a Pittsburgh-based customer.  The meeting reportedly was canceled at the last minute, but on information and belief, Dunn and Genovese had discussed and shared Confidential Information about the customer in preparation for the meeting.

40.    Defendants also connected their two territories by serving healthcare systems that extended across both.  For example, Dunn leveraged his relationship with a multi-state system in the NY Metro area and Connecticut to close a deal that included sales in Dutchess County, New York, which was part of Genovese's assigned territory.  Dunn collaborated closely with Genovese behind the scenes to secure this deal.  This is reflected in internal email traffic, including an October 20, 2025, email from Dunn to Genovese concerning four purchase orders Dunn had just secured within the system in which Dunn wrote to Genovese, "Rin – ping you[r] girl and see if they are sending you the PO."

41.    In another instance, Defendants met together with senior executives at a Westchester County-based hospital system that spans both of their territories.

42.    Defendants not only interacted with customers in each other's territories, but also

9

shared competitively valuable Confidential Information pertaining to customers and developments in their respective territories.  For example, Defendants both attended meetings to strategize about activity in each other's territories.  Dunn and Genovese covered geographies that aligned with two separate Joint Replacement implant sales teams.  Due to the obvious crossover between Dunn and Genovese's sales efforts, however, they were invited to attend both implant sales teams' internal meetings together.  Defendants learned competitively sensitive Confidential Information about customers and deals in each other's territories through these meetings.

43.     Defendants also regularly shared Confidential Information about customers in their territories by e-mail.  Dunn, for example, sent numerous e-mails to Genovese disclosing the details of customer deals in his territory (such as analyses of rental agreements and contracts).  Days before their resignations from Stryker, Dunn blind copied Genovese on an e-mail to a large New Jersey-based health system in which he was negotiating a multi-Mako system sale (including copies of the purchase agreements).  Genovese responded that she was "laughing out loud in awe of [his] antics."  The information Dunn shared with Genovese about this New Jersey customer is highly valuable Confidential Information—especially since Genovese now covers New Jersey for Zimmer.

44.     Further, on information and belief, Defendants held one-on-one meetings to brief each other on customer developments in their respective territories.  In April 2024, for example, Defendants met at a restaurant in Saratoga Springs, NY (in Genovese's territory), right after Genovese met with a customer in the same restaurant.

45.     Through these coordinated activities, each Defendant acquired valuable Confidential Information pertaining to customers and activity in each other's assigned territory.

46.     Dunn and Genovese deepened their partnership by teaming up to cover several open

territories.  In the two years before their resignations, Defendants shared responsibilities in the Delaware Valley region (including Southern New Jersey, Northern Delaware, and Eastern and Central Pennsylvania) and the Western Ohio/West Virginia region (minus the Cleveland area, which was already part of Genovese's assigned territory).  Dunn and Genovese traveled to those areas, solicited business and met with customers there, and split commissions for deals closed in those territories.

**E.    Dunn and Genovese Leave for Zimmer, a Direct Competitor of Stryker.**

47.    The joint replacement and orthopaedic robotics markets are highly competitive, and relationships of trust between sales representatives and customers are crucial to the success of the business.

48.    Zimmer is one of Stryker's main competitors in this area: Zimmer offers its own implants, as well as a competing orthopaedic robotics platform called ROSA.  Last year, Zimmer also acquired orthopedic robotics company Monogram Technologies and has publicly stated its intention to add Monogram's robotics platform to its portfolio by early 2027, confirmed the platform's FDA 510(k) clearance, and begun conducting clinical studies for a future version of its technology in July 2025.[2]

49.    Because Zimmer sells competing products and services, it is a "Conflicting Organization" within the meaning of the restrictive covenants. (*See* Agreements §§ 2.3, 2.4.)

50.    Zimmer has been actively hiring Stryker sales representatives and other personnel, amplifying the risk of unfair competition and the need to enforce departing employees' non-competes and other commitments.

---

[2] Zimmer Biomet Holdings, Inc., *Zimmer Biomet Completes Acquisition of Monogram Technologies*, Oct. 7, 2025, https://investor.zimmerbiomet.com/news-and-events/news/2025/10-07-2025-140729614.

51.    The ramp-up in Zimmer's hiring of Stryker sales representatives is part of what Zimmer CEO Ivan Tornos described as "[t]he evolution of [its] US Salesforce"—including the hiring of "200 plus sales reps in robotics"[3] who will enjoy two-year and, in some cases, three-year guarantees.[4]    This "represents the final core initiative in a transformation of [the] organization . . . ."[5]  Zimmer is working to build a "dedicated and specialized US sales channel" with the express goal of having a "leading position in the key areas where [Zimmer] compete[s]."[6] These high expectations naturally result in pressure on sales representatives to drive sales—even if it means taking risks during the hiring process.

52.    On November 15, 2025, Defendants resigned from Stryker and began working for Zimmer in orthopaedic robotics sales—Dunn as a Regional Sales Director and Genovese as a Regional Sales Manager.

53.    Dunn sent his and Genovese's manager a resignation e-mail *on behalf of Genovese*. The e-mail was largely written in first person plural ("we"), emphasizing the degree to which this was a coordinated departure.

**F.    Defendants Violate Their Post-Employment Obligations to Stryker.**

54.    On the heels of Defendants' departure, Stryker sent letters to Zimmer, Dunn and Genovese reminding them of Dunn and Genovese's post-employment obligations to the Company, including the non-competition, non-solicitation, and Confidential Information covenants at issue in this case.

---

[3] *See* Earnings Call, Feb. 10, 2026 (transcript at https://www.fool.com/earnings/call-transcripts/2026/02/10/zimmer-biomet-zbh-q4-2025-earnings-transcript/?msockid=3b2da5f237ee65081f91b33c36c76488).

[4] *See* Earnings Call Apr. 29, 2026 (transcript at https://m.investing.com/news/transcripts/earnings-call-transcript-zimmer-biomet-beats-q1-2026-earnings-forecast-stock-drops-93CH-4641795?ampMode=1).

[5] *See* Feb. 10, 2026 transcript.

[6] *See id.*

55.     These reminders precipitated the exchange of several letters between Stryker, and counsel for Zimmer, Dunn and Genovese regarding Dunn and Genovese's new roles.  The takeaway from that correspondence is that neither Zimmer nor Defendants believe their non-competes are implicated because Zimmer has assigned each Defendant a "new" sales territory.

56.     But rather than deploying Defendants in truly "new" territories, Zimmer essentially just swapped their assigned territories, as shown in the chart below.



57.     Defendants' attempt to circumvent their non-competes by switching territories fails because the non-competes are not rigidly limited by assigned territory.  Rather, they bar competition in any areas where Defendants "provided services, covered cases, made proposals,

made sales or serviced products whether directly or indirectly." (Agreements § 6.3(c).)  That language was crafted to cover situations exactly like this, where employees both have an assigned territory and provide substantial support in other geographic areas.  Because Defendants actively supported each other's sales efforts across both of their Stryker territories, including the making of proposals, each of their non-competes extends into both of their assigned territories—and thus prohibits Defendants' current responsibilities at Zimmer.

58.    Dunn and Genovese have also breached their customer non-solicitation and confidentiality obligations by feeding each other Confidential Information, then using that information to improperly target customers.  For example, while he was at Stryker, Dunn was in the process of securing internal approval to propose a deal structure to a surgery center in Stamford, Connecticut that was not considering Zimmer's ROSA robot.  The deal under internal consideration had not yet been communicated to the customer.  Shortly after Dunn left, Zimmer made a nearly identical proposal, with slightly lower numbers.  In short, Genovese took over Dunn's Connecticut territory and is now using Confidential Information from Dunn about Connecticut customers to divert business away from Stryker.

59.    This is a clear breach not only of the Agreement's confidentiality provisions (as Defendants are using Stryker's Confidential Information against it), but also of the customer non-solicitation covenant.  With respect to the latter, Defendants agreed not to "solicit" or even "contact" a "Stryker Customer" (i.e., a customer with whom they had material contact or about whom they learned Confidential Information during the last year of their employment).  (Agreement § 6.2.)  Because Dunn and Genovese had extensive contact with each other's customers and likely learned Confidential Information about them—Defendants are prohibited from engaging in precisely the type of behavior that occurred in Stamford.  Furthermore, each such

14

breach of the customer non-solicitation provision is a violation by both Defendants because the covenant prevents them from "directly or indirectly" engaging in prohibited solicitations. (*See id.*) In the example above, Genovese engaged directly in an improper solicitation and Dunn did so indirectly.

60.    This is not the only time Defendants simultaneously breached multiple provisions of the Agreements.  While working for Zimmer, Dunn had dinner in Binghamton, NY with three surgeons representing a surgical center managed by a surgery center alliance.  This meeting was a violation of Dunn's confidentiality, non-competition and customer non-solicitation commitments. Dunn had significant Confidential Information about customers managed by the alliance, including the Binghamton group, which he acquired when he developed close relationships with the alliance's leadership and sold products to numerous surgery centers during his time at Stryker.  He was even involved in discussions at Stryker regarding the Binghamton center he is now pursuing for Zimmer.  Stryker has been directly and concretely harmed by these breaches: the surgery center operator was on the verge of signing a deal with Stryker, but has now paused those discussions.

61.    Current Stryker employees have witnessed Defendants attending meetings, dinners, and horse racing events with Stryker's customers—both together and separately—in New York City, New Jersey, and elsewhere.

62.    Defendants have further breached the Agreements by directly and indirectly soliciting Stryker employees to leave Stryker for Zimmer.  Dunn and Genovese bragged to a current Stryker employee that Zimmer "will pay for people to come over" and shared the details of their deals with Zimmer.  They told the employee that they "would come get [him]" and then asked him to download WhatsApp so they could speak more freely.  In the chat, Dunn admitted that they were working to recruit two more Stryker employees.  Current Stryker employees report that Dunn has

15

continued to contact Stryker personnel, as recently as March 2026.

63.    On information and belief, Zimmer is also using a third-party recruiter who has been referencing Dunn's name and promoting his new group at Zimmer to encourage Stryker employees to leave for Zimmer.

**G.    Defendants' Unlawful Acts Are Facilitated by Their Former Manager at Stryker, Who Later Joined Them at Zimmer.**

64.    On information and belief, Dunn and Genovese enlisted the help of their former manager, Area Sales Director Anthony Albano—who left for Zimmer four months after them (on March 20, 2026)—to facilitate their breaches of the Agreements.

65.    After Dunn and Genovese left, Albano avoided hiring new sales representatives to cover the open territories remaining at Stryker.  In Buffalo, for example, Albano's colleagues were pushing to fill an open Account Executive role with a high-performing Stryker employee from another territory.  Albano inexplicably dragged out the process and went radio silent on the candidate for months.

66.    This was not the only highly qualified candidate Albano declined to hire for Stryker. He told another qualified candidate that Stryker would not be hiring him, but that he should "stay close" to Albano.

67.    In the open territory that included New York City and Connecticut, Albano neglected to onboard the sales representative Stryker hired to cover the open territory, then delayed sharing customer contacts with the new sales representative—thereby slowing and hampering Stryker's ability to save business in the area from misappropriation by Dunn and Genovese.  Other Stryker employees ultimately had to step in to walk the employee through onboarding.

68.    On information and belief, Albano took these actions in coordination with Dunn and Genovese to facilitate Defendants' diversion of customers and goodwill to Zimmer.

16

**H.    Stryker Suffers Significant Harm as a Result of Defendants' Misconduct.**

69.    Stryker has suffered and will continue to suffer substantial harm as a direct result of Dunn and Genovese's unlawful acts.  Among other things: (a) Stryker's relationships with certain customers are being undermined; (b) the Company is losing revenue (in an amount to be determined at trial, but well in excess of the $75,000 jurisdictional threshold); (c) valuable employees in whom substantial investments were made are leaving Stryker; (d) the Company's proprietary and Confidential Information is being exploited by Zimmer, a direct competitor; and (e) it is suffering reputational harm and loss of goodwill.

70.    The investments Stryker made in its Joint Replacement and MET businesses are being undermined by Defendants' conduct.

<u>COUNT I:</u>

**BREACH OF CONTRACT**

71.    Stryker hereby repeats, realleges, and incorporates by reference the allegations in Paragraphs 1 through 70 above.

72.    Dunn and Genovese's Agreements with Stryker constitute valid and enforceable contracts.  Defendants concede as much in their post-termination correspondence.  In a letter dated March 3, 2026, for example, their counsel represented that Defendants "have every intention to comply with the reasonable scope of their restrictive covenants."  That is a clear acknowledgement that the contract is valid and enforceable.

73.    Stryker performed all duties and obligations it owed Dunn and Genovese under the Agreements (and Defendants' counsel has never claimed otherwise in any of its letters to Stryker).

74.    The post-employment restrictive covenants in the Agreements are reasonable in scope and duration and are necessary to protect Stryker's legitimate interests in its confidential

17

business information, customer and employee relationships, and goodwill—as acknowledged by Defendants. (*See* Agreements §§ 1.1. 7.6, 8.1.)

75.    Defendants have breached—and, on information and belief, continue to breach—the restrictive covenants in numerous ways.

76.    As set forth in detail above, Dunn and Genovese have violated:

1.    **Section 6.3** of the Agreements (the non-compete) by selling robotics systems for Zimmer in extra-territorial areas where they were active for Stryker;

2.    **Section 6.2** of the Agreements (the customer non-solicit) by directly and indirectly targeting Stryker customers with whom they had material contact while at Stryker or about whom they possessed Confidential Information;

3.    **Section 6.4** of the Agreements (the employee non-solicit) by directly and indirectly encouraging Stryker employees to join them at Zimmer; and

4.    **Section 5.1** of the Agreements (the confidentiality provision) by using Stryker's Confidential Information to craft competing customer proposals or otherwise benefit Zimmer at Stryker's expense.

77.    These breaches are directly and proximately causing significant injuries to Stryker, which has lost and continues to lose customers, revenue, goodwill, and quality employees.  It also has lost and continues to lose control of important proprietary and confidential business information of the type courts routinely intervene to protect in cases like this.

## PRAYER FOR RELIEF

WHEREFORE, Stryker respectfully prays that this Court enter judgment against the

Defendants:

(1)    Enjoining Defendants from further breaching Sections 5.1, 6.2, 6.3, and 6.4 of the Agreements;

(2)    Awarding Stryker monetary damages in an amount to be proven at trial plus pre-judgment and post-judgment interest;

(3)    Awarding punitive damages and enhanced damages as allowed under applicable law;

(4)    Awarding Stryker its reasonable attorneys' fees and costs of this action under Section 8.1 of the Agreements and/or applicable law; and

(5)    Awarding Stryker all other relief as may be just and proper.

## JURY DEMAND

Under Rule 38 of the Federal Rules of Civil Procedure and/or other applicable law or rule,

Stryker hereby demands a trial by jury on all issues in this case.

Dated: May 8, 2026                         Respectfully submitted,

**NELSON, MULLINS, RILEY & SCARBOROUGH LLP**

*/s/ Dustin B. Rawlin*
Dustin B. Rawlin
1100 Superior Avenue
Suite 2000
Cleveland, OH 44114
dustin.rawlin@nelsonmullins.com

Aaron Lang (*pro hac vice forthcoming*)
Zygimante Andrijauskaite (*pro hac vice forthcoming*)
330 Madison Avenue, 27th Floor
New York, NY 10017
aaron.lang@nelsonmullins.com
zygimante.andrijauskaite@nelsonmullins.com

*Counsel for Plaintiff Stryker Corporation*

19

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2026, a copy of the foregoing Complaint was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.  Parties may access this filing through the Court's System.

<div align="center" style="display:inline-block"></div>

*/s/ Dustin B. Rawlin*
Dustin B. Rawlin